UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:

DONALD W. RAPER,

      Plaintiff**,**

vs.

REGAL MARINE INDUSTRIES, INC., and
LEGENDARY ASSETS & OPERATIONS, LLC
d/b/a LEGENDARY MARINE,

      Defendants.
_____/

## **COMPLAINT**

Plaintiff, Donald W. Raper, sues Defendants, Regal Marine Industries, Inc. and Legendary Assets & Operations, LLC d/b/a Legendary Marine, and alleges:

### **THE PARTIES, CASE SUMMARY, JURISDICTION AND VENUE**

1.      At all material times, Plaintiff, Donald W. Raper (hereinafter "Raper"), is a U.S. citizen who is domiciled in the State of South Carolina.

2.      Mr. Raper is the original retail purchaser of a new 2016 model 53-foot Regal Sport Coupe motor vessel bearing Hull Identification Number RGMPW029J516 (hereinafter "vessel").

3.      Mr. Raper purchased the new 2016 model vessel on March 15, 2017 for $1,050,428.00.

4.      Mr. Raper is a "consumer" under Florida Statute § 671.201 and the federal Magnuson Moss Warranty Act, Title 15 U.S.C. § 2301(3).

5.      At all material times, Defendant, Regal Marine Industries, Inc. (hereinafter "Regal") is a Florida corporation that maintains its principal place of business at 2300 Jetport Drive, Orlando, Florida 32809.

6.      Regal manufactured the 2016 model 53-foot Sport Coupe motor vessel.  A copy of the vessel's U.S. Coast Guard Abstract of Title, which shows Regal built the vessel and Raper is the first retail purchaser is attached hereto as Exhibit "1".

7.      Regal provided Raper a written Limited Warranty for the new 2016 model vessel. A copy of Regal's Limited Warranty is attached hereto as Exhibit "2".

8.      Regal is a "supplier" and "warrantor" under Title 15 U.S.C. § 2301(4) and (5) since it provided a Limited Warranty to Raper when he bought the new vessel.

9.      As explained below, Raper believed he bought the vessel from Regal and that Regal used Sundance Marine as its agent to prepare the vessel for delivery and process the paperwork. No one informed Raper that he was buying the boat from Legendary Assets & Operations, LLC d/b/a Legendary Marine before the sale closed on March 15, 2017.

10.      Defendant, Legendary Assets & Operations, LLC d/b/a Legendary Marine ("Legendary"), is a Florida limited liability company that maintains its principal place of business at 4601 Legendary Marina Drive, Destin, Florida, 32541.

11.      Legendary is an authorized Regal boat dealer.

12.      Legendary purchased the new 2016 model vessel from Regal on December 18, 2015.  See the vessel's U.S. Coast Guard Abstract of Title attached hereto as Exhibit "1", which shows Regal sold the vessel to its dealer, Legendary.

13.      Legendary is a "merchant" under Florida Statute § 672.104(1) because it sells Regal recreational boats, including this vessel, to consumers.

14.     Legendary signed a bill of sale transferring ownership of the vessel to Raper on March 15, 2017.  A copy of the bill of sale is attached hereto as Exhibit "3".  (Note:  The bill of sale shows Raper's business address and not his residential address, which is located in Anderson, South Carolina).

15.     Legendary used South Florida Assets & Operations, LLC d/b/a "Sundance Marine" ("Sundance") as an undisclosed broker to sell the vessel on its behalf.

16.     Sundance is also an authorized dealer of Regal boats.

17.     As an undisclosed broker serving an undisclosed seller, Sundance prepared a Consumer Credit Contract using Sundance's own form contract.

18.     The Sundance Consumer Credit Contract for the vessel sale to Raper does not identify Legendary as either the "seller" or "dealer."  A copy of Sundance's purchase and sale agreement is attached hereto as Exhibit "4".

19.     A plain reading of the Consumer Credit Contract shows Legendary did not disclaim the implied warranties of merchantability or fitness for a particular purpose since Legendary is not disclosed as either seller or dealer in the Sundance contract.  Nor did Sundance disclose it was acting as a broker for the undisclosed seller, Legendary.  See Exhibit "4".

20.     As explained below, Regal built the vessel's fiberglass hull without the proper structural support required for the main engines.

21.     The fiberglass hull manufactured by Regal is supposed to include various transverse and longitudinal stringers or a suitable framing system to provide necessary strength to the vessel's hull so it may function as designed.  This case involves Regal's failure to install necessary structural supports to Raper's vessel to properly contain the forces generated by the Regal installed

engines and pod drive system.  The physical forces created by the drive systems caused, among other things, the excessive vibrations as explained below.

22.     The lack of hull structure support for the main engines mounting to the vessel's hull allows them to excessively vibrate during operation causing increased operating temperatures and mechanical failures.

23.     The excessive engine vibrations are caused by the lack of structural hull supports to stiffen the stringers upon which the engines are mounted resulting in repeated drive system failures during Raper's ownership.  The "drive system" is composed of the engines, bell housings connecting the Zeus pod drive system, an advanced marine propulsion system.

24.     Cummins Inc., the engine and Zeus pod drive manufacturer, provided Raper a written warranty for the vessel's drive system.

25.     During Raper's ownership, Cummins replaced three (3) starboard engines, two (2) port engines, two (2) starboard pod drives, and three (3) port pod drives under its warranty.

26.     Since continuous mechanical failures kept occurring in the often replaced drive systems, Cummins performed extensive tests and analysis of the vessel's drive system to determine the cause of its equipment failures.

27.     Mr. Raper hired experts to participate with Cummins' engineers in inspecting and testing the vessel to determine the cause of the continued engine and related components failing with relatively little use.

28.     Regal was strongly urged to attend all testing and to actively participate by sending its experts to the vessel during testing designed to determine the cause of the repeated mechanical failures.  However, Regal chose not to participate in the testing.

4

29.     Not only did Regal not participate in the proposed joint inspections and testing of the vessel, Regal refused to produce records, including design drawings, as-built plans and laminate lay-up schedules to assist with the investigation of Regal's product failures.

30.     Cummins' engineers performed multiple sea trials of the vessel using scientific instruments to measure the engines' performance and the forces exerted by running the engines in different sea conditions.

31.     Mr. Raper's expert participated in the extensive inspections and sea trials of the vessel designed to determine the cause of the excessive mechanical failures.

32.     After lengthy testing and detailed scientific analysis, Cummins' engineers determined the drive system failures were caused by a lack of necessary hull structure support for mounting the main engines to the vessel's hull.

33.     Mr. Raper's naval architect concurs with Cummins' engineers' opinions.

34.     When Regal submitted its original 53-foot model boat to Cummins for it to approve the engine bed design would properly support the Cummins engines and Zeus pod drive system, Cummins engineers approved the submitted design.  It was necessary for Cummins to approve that the engine bed mounting system was adequate for the proper installation of Cummins' engine and pod drive system since Cummins was independently issuing its own written warranty for these products.

35.     Based on Regal's original prototype and structural plans, Cummins agreed to supply Regal with engines and pod drives for the 53-foot model series and to issue its warranty covering its manufactured items.

36.     At some point, Regal deviated from the approved design and/or manufacturing process and started making the Regal 53 Sport Coupe without the Cummins approved engine bed design.

37.     Regal's change of design and/or manufacturing process removed two important transverse hull structures that provide necessary hull strengthening to support the drive system in the 53 Sport Coupe boats.

38.     Regal's hull design and/or manufacturing changes occurred without Cummins knowledge or approval.

39.     By not manufacturing the hull with the transverse hull structure supports, the main engines sit on two longitudinal structural hull supports that are inadequate for the engine mounts or vibration isolators to function properly.  As built, the Regal hull allows the engines in Raper's vessel to operate with excessive vibrations and temperatures.

40.     Below is a picture showing the original Cummins approved engine bedding design of a Regal 53 Sport Coupe with both transverse and longitudinal hull structure supports for the port main engine.  The picture is also attached hereto as Exhibit "5".  The transverse stringer supports that are missing from Raper's vessel are circled in the picture below.



41.     The picture below of Raper's boat, as-built, shows the missing necessary transverse hull support structures.  A copy of the picture is also attached hereto as Exhibit "6".



42.     Cummins provided Raper with a copy of its engineers' written report finding the continued cause of the vessel's drive system failures.  A copy of Cummins' written report is attached hereto as Exhibit "7".

43.     Mr. Raper's naval architect also prepared a detailed written report concerning the vessel's defective hull structure, which explains the defects and why they cannot be repaired.  A copy of Winchester Design's written report is attached as Exhibit "8".

44.     Just as the drive systems component parts continue to self-destruct with use, thermography images taken of the vessel's hull reveal significant areas, which may be voids and/or damages in the fiberglass hull structure where the drive system is located.  A copy of the expert thermography report with images showing probably areas of damage in the fiberglass hull structure is attached as Exhibit "9".

45.     The remedy provided under Regal's Limited Warranty fails of its essential purpose because the structural hull defects, damaged hull structure, and damaged drive systems cannot be fixed.

46.     Mr. Raper demanded Regal take the vessel back and give him a refund on July 4, 2018 and again on November 1, 2018 because he was not able to use the vessel because of the repeated major mechanical failures to the Cummins drive systems.

47.     Regal refused to take the vessel back and provide a refund to Raper for the unmerchantable, unfit and unrepairable vessel.

48.     Mr. Raper sues Regal to recover damages under alternative causes of action for breach of written warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and revocation of acceptance because Regal failed to fix or is unable to cure the vessel's defective hull structure and damage drive systems, which renders the vessel unmerchantable and unfit as a recreational boat.

49.     As alternative claims for relief, Raper sues Legendary to recover damages for breach of implied warranty of merchantability and revocation of acceptance because it sold the structurally defective vessel to him.

50.     This Court has diversity jurisdiction under Title 28 U.S.C. § 1332 because this action involves a matter in controversy that exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states.

51.     This Court also has federal question jurisdiction under Title 28 U.S.C. § 1331 and Title 15 U.S.C. § 2310(d)(1)(B) because it involves a consumer's statutory cause of action against a warrantor, Regal, under the Magnuson-Moss Federal Trade Commission Act, Title 15 U.S.C. § 2301, *et. seq.*

52.     To the extent any of the causes of action alleged herein do not fall within diversity or federal question jurisdiction, this Court has supplemental jurisdiction to resolve such claims under Title 28 U.S.C. § 1367.

53.     Regal is subject to personal jurisdiction in the State of Florida because:

(a)     It induced Raper to purchase the vessel while showing it to him at the Miami International Boat Show in Miami-Dade County, Florida;

(b)     It breached its written and implied warranties in Florida;

(c)     It operates, conducts, engages in or carries on a business venture in Florida;

(d)     It maintains its principal place of business in Florida;

(e)     It engages in substantial activity within Florida;

(f)     It committed tortious acts within Florida; and/or,

(f)     It committed one or more of the acts described in Florida Statutes §§ 48.081, 48.181 or 48.193.

54.     Legendary is subject to personal jurisdiction in the State of Florida because:

(a)     It sold the vessel to Raper in this State;

(b)     It breached the implied warranty of merchantability in this State;

(c)     It operates, conducts, engages in or carries on a business venture in this State;

(d)     It maintains its principal place of business in this State;

(d)     It engages in substantial activity in this State;

(e)     It committed tortious acts within this State; and/or,

(f)     It committed one or more of the acts described in Florida Statutes
§§ 48.081, 48.181 or 48.193.

55.     This Court is the appropriate venue for resolving the causes of action alleged herein under Title 28 U.S.C. § 1391(b)(1) and (2).

56.     The causes of action asserted in this Complaint are governed by the Magnuson-Moss Federal Trade Commission Act, Title U.S.C. § 2301, *et. seq*, and Florida Law.

57.     Mr. Raper has fulfilled all conditions precedent for filing this action.

## **GENERAL ALLEGATIONS**

58.     Mr. Raper attended the 2017 Miami International Boat Show, which occurred during February 16 – 20, 2017.

59.     Regal set up an office within its exhibition space at the Boat Show with Regal signs prominently posted.

60.     Mr. Raper visited Regal's exhibition at the 2017 Miami International Boat Show on February 17, 2017.

61.     The sales personnel at the Regal exhibition site wore Regal shirts and Regal name tags.

62.     Regal's employees or agents showed the vessel to Raper on February 17, 2017.

63.     Mr. Raper told Regal's employees or agents that he wanted to buy a new boat that he and his wife could take on extended trips and live aboard.

64.     Regal's employees or agents told Raper the vessel was built to go in the ocean, make extended trips and was suitable for him and his wife to live aboard.  Regal's representations convinced Raper to buy the new vessel.

65.     Regal's employees or agents negotiated with Raper about the purchase price of the vessel inside the Regal office at the 2017 Miami International Boat Show.

66.     On February 17, 2017 Regal's employee or agent and Raper signed a Boat Show Buyer's Order inside Regal's office at the Miami International Boat Show.   Based on his interaction with Regal, Raper believed he was buying the new 2016 model vessel directly from Regal.  A copy of the Boat Show Buyer's Order is attached hereto as Exhibit "10".

67.     The Boat Show Buyer's Order did not disclaim the implied warranties of merchantability or fitness for a particular purpose.  See Exhibit "10".

68.     Regal informed Raper that Sundance Marine would handle the paperwork and prep the vessel for delivery.

69.     On March 15, 2017, Raper went to Sundance's office at 3321 NE Indian River Drive, Jensen Beach, Florida 34957 to sign a promissory note and preferred ship mortgage so Raper could finance the vessel.  At this time, Sundance had Raper sign a Consumer Credit Contract for his lender.  See Exhibit "4".

70.     Sundance, as an undisclosed broker for an undisclosed seller, Legendary, delivered the vessel to Raper at Sundance's Jensen Beach facility on March 16, 2017.

71.     When the new vessel was delivered to Raper, it had 106 hours on the main engines.

72.     Mr. Raper documented the vessel with the U.S. Coast Guard as Official Number 1276723.  A copy of the U.S. Coast Guard's Abstract of Title for the vessel is attached hereto as Exhibit "1".

73.     Regal's Limited Warranty provided to Raper states in relevant part:

WHAT IS COVERED:  This Limited Warranty applies only to Regal boats beginning with model year 2008.

LIFETIME LIMITED STRUCTURAL HULL WARRANTY: Regal Marine Industries, Inc. warrants to the original retail purchaser of the boat if purchased from an authorized Regal dealer that the selling dealer or Regal will repair or replace the fiberglass hull if it is found to be structurally defective in material or workmanship for as long as the *original* retail purchaser owns the boat. For purposes of this warranty, the hull is defined as the single fiberglass casting which rests on the water. This limited warranty is subject to all limitations and conditions explained below.

FIVE-YEAR TRANSFERABLE LIMITED STRUCTURAL HULL WARRANTY: In addition to the Lifetime Limited Structural Hull Warranty, Regal offers a Transferable Five-Year Limited Structural Hull Warranty. Under the Five-Year Transferable Limited Structural Hull Warranty, Regal will repair or replace the fiberglass hull if it is found to be structurally defective in material or workmanship within the first (5) years after the date of delivery to the original retail purchaser….

See Exhibit "2".

74.     Since Regal was directly involved in selling the vessel to Raper, Regal impliedly warranted the vessel was merchantable under Florida Statute § 672.314.

75.     Regal also impliedly warranted to Raper that the vessel was fit for its purpose as a recreational boat capable of making extended trips pursuant to Florida Statute § 672.315.

76.     Title 15 U.S.C. § 2308(a) of the Magnuson-Moss Federal Trade Commission Act does <u>not</u> allow Regal, as warrantor, to disclaim the implied warranties of merchantability or fitness for a particular purpose.

77.     On August 10, 2017, Mr. Raper and his wife were on the vessel in the vicinity of Annapolis, Maryland when the port engine experienced a loss of RPM and the port exhaust riser clamp bolt sheared off. The engine room filled with black soot from the port engine's exhaust. When this event occurred, the engine hours were 240. It took two weeks, August 10 – 26, 2017 for repairs and cleanup.

78.     On August 26, 2017, Mr. Raper and his wife departed from Annapolis, Maryland aboard the vessel.  One hour out from Annapolis the vessel's starboard engine overheated.  The engine had 241 hours, just one additional hour after completion of the prior repairs.

79.     Mr. Raper motored the vessel on the port engine to Harrington Harbour North, Tracys Landing, Maryland to obtain more repairs.  The belt guard for the starboard engine was removed and the starboard serpentine belt was found to be shredded.  The port engine serpentine belt was also inspected and showed signs of abnormal chaffing and deterioration.  Zimmerman Marine ordered three sets of serpentine belts for the engines.  One set was for installation on the engines, and the other two sets were stored on board the vessel as spare parts.

80.     On August 31, 2017 Zimmerman Marine installed new belts on the vessel's engines.  Mr. Raper departed with the vessel to continue the trip back to the vessel's home port of Charleston, South Carolina.

81.     On September 2, 2017, the vessel's starboard engine overheated again.  Mr. Raper motored the vessel on the port engine to River Dunes Marina, Oriental, North Carolina for repairs.  The inspection revealed the new starboard serpentine belt had failed; two alternator bolts had sheared; and the starboard engine's freeze plug had blown out.  Foster Mobile Marine installed a new serpentine belt for the starboard engine and replaced the sheared alternator bolts.  Foster Mobile Marine expressed concern about the overall drive train reliability because of the blown freeze plug from the engine block.

82.     On September 5, 2017, Raper motored the vessel on the port engine from Oriental, North Carolina to Jarrett Bay Marina, Beaufort, North Carolina for further service.  Mr. Raper had to contract for the vessel to be hauled from the water and placed in dry storage because a hurricane threatened the area.

83.     On or about September 5, 2017, Raper notified Regal about the ongoing problems with the vessel.   Robert Denny, Regal's employee, advised Raper to contact Larry Burney at Cummins to address the problems.

84.     Coastal Diesel, a local Cummins dealer, performed service on the vessel's engines. Coastal Diesel changed the serpentine belts, alternator bolts, exhaust manifold, and turbo coolant hose.  The underlying cause of the ongoing engine problems had yet to be determined.

85.     On October 11, 2017, Raper departed from Jarrett Bay Marina, Beaufort, North Carolina and proceeded to the vessel's home port of Charleston, South Carolina.

86.     On October 12, 2017, the vessel docked at her home port of Charleston, South Carolina.  At this time, the vessel's port engine had 277 hours and the starboard engine had 272 hours.

87.     Shortly after arriving in Charleston, Raper contacted Larry Burney, Cummins' employee, to express concern about the engines.  Mr. Raper also informed Cummins that he was not satisfied with Coastal Diesel's work.

88.     On October 27, 2017, Cummins Charleston, a local Cummins dealer, inspected the vessel's engines.  The engines' serpentine belts had to be replaced again due to abnormal belt chaffing.  In addition, water was discovered coming from a 2" exhaust hose.  At this point the port engine had 287 hours and the starboard engine had 282 hours.

89.     On October 28, 2017, a bilge pump failed, and a high water alarm sounded.  Mr. Raper checked the bilge throughout the night.  The next day, Raper picked up a float switch from West Marine and replaced the defective switch in the bilge pump.

90.     On October 30, 2017, Ross Marine replaced the 2" exhaust hose.

91.     On November 22, 2017, Ross Marine replaced a 3" hose.

92.     On December 27, 2017, Raper and his wife departed with the vessel from Charleston for South Florida.

93.     On December 29, 2017, Raper had to add 1 gallon of coolant to the starboard engine.

94.     On December 30, 2017, Raper had to add 1 gallon of coolant to the starboard engine.

95.     On December 31, 2017, Raper had to add 1 gallon of coolant to the starboard engine.  He also noticed there was oil pressure and engine temperature difference between the port and starboard engines.

96.     On January 1, 2018, the vessel arrived at Fort Pierce, Florida.  Mr. Raper checked the engines and added 1 gallon of coolant to the starboard engine.  He also noticed there was a greater difference developing between the port and starboard engine oil pressures.  Mr. Raper contacted Larry Burney at Cummins about these problems.  At this time, the vessel's port engine had 342 hours and the starboard engine had 338 hours.

97.     On January 11, 2018, a local Cummins dealer, Shearwater, replaced the serpentine belts on the engines because they were showing abnormal signs of wear.  Shearwater also replaced the starboard turbo for suspected loss of coolant.

98.     On February 9, 2018, the vessel was hauled from the water so the starboard engine could be removed to investigate the low oil pressure issue.

99.     On February 13, 2018, the vessel's starboard engine was removed from the vessel.

100.     On February 14, 2018, Mr. Raper met with Shearwater to discuss the starboard engine.  The oil sample test results showed abnormal levels of iron, silicon, copper and potassium.

101.    On February 14, 2018, Raper received a phone call from Cummins' representative, Larry Burney, and they discussed the engine issues.  Cummins offered to replace the starboard engine on two conditions: (a) Raper had to sign a liability waiver; and (b) Raper had to purchase an extended warranty for both engines.

102.    Mr. Raper refused to sign a liability waiver.

103.    Cummins went ahead and replaced the vessel's starboard engine under its warranty without a signed waiver from Mr. Raper.  Cummins also provided Raper an extended engine warranty without cost.

104.    The vessel was in Fort Pierce, Florida for repairs during January 1, 2018 to March 7, 2018.

105.    Shearwater Marine replaced the vessel's starboard engine, and a sea trial was performed on March 7, 2018.  After the sea trial, Raper departed with the vessel from Fort Pierce and cruised back to the home port of Charleston, South Carolina.

106.    While Raper was using the vessel on May 4, 2018, the vessel's starboard engine serpentine belt shredded.  The new starboard engine overheated with just 35 hours on it.  Upon inspection by another Cummins dealer, the starboard engine's harmonic balancer or damper was found to be chocolate brown with black spots.  A harmonic damper is a device fitted to the crankshaft to counter torsional and resonance vibrations from the crankshaft.  The discolored appearance of the harmonic balancer indicated an overheating condition.  In addition, the starboard engine exhaust riser strut had a broken weld and was loose.

107.    During May 22 - 23, 2018, Cummins' engineers inspected both of the vessel's engines.  In addition to the problems described in paragraph 103, the port exhaust riser support bolts were found loose.  The port drive shaft guard had stress cracks.  Another oil test was

performed, which showed there was abnormal levels of metals in the oil.  Cummins' engineers believed the engine belt failures were due to improper engine alignment and vibration isolation loading.  Cummins installed new vibration isolators on the engines and re-aligned the engines.

108.   On June 30, 2018, the vessel's port transmission pod housing failed.  Mr. Raper had to motor the vessel back to Charleston on one engine.

109.   On July 4, 2018, Mr. Raper sent an e-mail to Regal's customer relations representative, Robert Denney, asking Regal to take the vessel back and provide him a refund because of the constant breakdowns which precluded him from using the vessel as it was intended.

110.   On July 6, 2018, Ross Marine hauled the vessel to replace the damaged transmission pod.

111.   On July 12, 2018, Mr. Raper met with <u>both</u> Cummins and Regal representatives to discuss the ongoing problems with the vessel.  After this meeting, Cummins representative, Larry Burney, sent Raper an e-mail, which said:

> Dear Mr. Raper,
>
> Thank you for taking the time to meet with Cummins and Regal this morning.  It is important to us that you have a good understanding of the situation and are confident in your engines and our support of them.  Per your request, here is a synopsis of our discussion:
>
> a.  Progressive damage to the starboard engine from belt failure since engine replacement:  Since the throttle was pulled back and the engine shut down quickly, damage was minimal.  All of the parts effected have been replaced at the same time as the alignment and shimming.
>
> b.  Damage to the starboard pod:  Our technicians did not find any damage to the starboard pod.  Because of the damage to prior vibration dampeners (before the alignment was corrected), we believe the dampener was absorbing most of the torsional vibrations in this case, which is its purpose.

   c.  Port engine oil analysis results:  The oil analysis has levels of wear metals that are higher than would be expected for a normal used oil sample, but not high enough to be alarming or to indicate engine damage.  These are to be expected because of the elevated level of sodium, which we know was being caused by the aftercooler leaking.  Both independent oil analysis laboratories suggest changing the oil and filters (which you have done) and resampling after some use.  That is our suggestion as well.  Since the source of sodium has been eliminated, the next oil sample is expected to be trending to normal. Suggest sampling at 6 months or 125 hours.

   d.  Damage to the port pod beyond the failed drop box:  Since the alignment and isolator loading issue was not as significant on the port engine, we do not suspect that there is progressive damage to the pod.  The drop box failure was most likely coincidental, however unfortunate.  I will request that Mercury conduct a failure analysis on the drop box so we can obtain a better understanding of the failure.

   e.  Confidence:  To increase your confidence, Cummins will provide a 6 year/3000 hour Encompass Extended Warranty for your engines as a goodwill gesture.  I have attached a detailed explanation of this warranty.

   f.  Current port pod repair status:  Cummins Charleston received the new transmission and drop box yesterday and is starting the installation today.  I will relay to them that you will be back in town mid-week next week and they will reach out to you to schedule a sea trial.  Regal intends to send a Regal representative to attend the sea trial as well.

Thank you,

Capt. Larry Burney, Cummins Sales and Service

112.    On July 19, 2018, the vessel went out for sea trial to test the new port pod.  Robert Denney, Regal's representative, was on board for the sea trial.

113.    On August 8, 2018, Cummins replaced the engine serpentine belts after 65 hours of operation due to abnormal wear.

114.    On September 23, 2018, Raper discovered green oil leaking from the starboard transmission pod.  It turned out to be from a missing rubber check valve in the oil reservoir cap. Mr. Raper notified both Cummins and Regal of this.

115.    On October 24, 2018, the vessel was cruising in the Atlantic Ocean about 10 miles offshore Savannah, Georgia when the starboard engine failed after only 171 hours of operation. Mr. Raper motored the vessel on one engine to Thunderbolt boatyard to obtain repairs.  Oil and aluminum shavings were found in the bilge space.  Cummins sent a service technician, Jon Collins, to inspect the drive system.  Mr. Collins discovered the crank shaft was broken.  In addition, the weld for the port exhaust riser vertical strut was found broken and a bolt was loose.  The port drive shaft guard bolt was found in the bilge space.  The port transmission pod had low hydraulic oil.

116.    On November 1, 2018, Mr. Raper sent an e-mail to Regal's representatives, Robert Denney and Duane Kuck, with a copy to Cummins representative, Larry Burney, about the history of mechanical breakdowns and other vessel defects that Raper experienced during the 14 months he owned the vessel.  A copy of Mr. Raper's November 1, 2018 e-mail is attached hereto as Exhibit "11".

117.    Mr. Raper's November 1, 2018 e-mail said he either wanted the vessel to undergo a needed a complete refit, or Regal should take the vessel back and refund his purchase price.  See Exhibit "11".

118.    Cummins agreed to provide the vessel with two new main engines and drive pods under its warranty.  Cummins supervised Ross Marine and Thunderbolt in replacing the vessel's drive system.

119.    The new drive system was installed in the vessel between December 30, 2018 and February 13, 2019.

120.   On February 14, 2019, Cummins oversaw the sea trial of the vessel to assess whether the new engines and pods were operating correctly.

121.   On March 14, 2019, a Cummins dealer changed the engines and pod oil at the 25 hour service.

122.   On June 14, 2019, abnormal serpentine belt chaffing was observed on both new engines.

123.   On June 15, 2019, Ross Marine performed repairs to the vessel's trim tabs, seakeeper, underwater lights, bow spotlight and resolve an XM radio problem.  Cummins also inspected the drive system and discovered a vertical strut for the exhaust riser loose.  The temperature strip on the engine balancer/dampener indicated it reached 390 Fahrenheit, which is too high.

124.   On August 27, 2019, Cummins engineers were on the vessel and performed temperature and vibration testing.

125.   On August 28, 2019, Cummins engineers performed a sea trial of the vessel.  The engine alignments to the pods were confirmed to be correct.

126.   On August 29, 2019, Cummins engineers finished collecting their data from the tests.

127.   On September 13, 2019, new belts and dampeners were installed on both engines.

128.   On October 31, 2019, Mr. Raper was navigating the vessel 10 miles offshore of Savannah, Georgia when the high pressure diesel fuel line ruptured spraying fuel all over the hot engines and engine room.  The vessel went back to Thunderbolt Marine boatyard for repairs. Cummins sent a technician from Charleston to service the engine.  During repairs, the Cummins technician discovered the fuel pump had separated from the engine bell housing because two bolts

had sheared off and one bolt had backed out.  The engine bell housing was cracked.  Both exhaust riser strut bolts were discovered missing.  This engine failure occurred with only 127 hours of operation.

129.    On November 18, 2019, repairs were completed on the vessel's port engine.

130.    On November 19, 2019, Mr. Raper took the vessel back to its home port of Charleston, South Carolina.  Upon arrival, Raper noticed the starboard engine serpentine belt was abnormally chaffing again.

131.    On February 3, 2020, Cummins engineers (Leo Schertz, Jacob Sunding, Chad Kivett, and Mayosore Ajeigbe), Regal representatives (Robert Denney, Mark Skrypeck), Mr. Raper, and Raper's naval architect (Peter Gimpel of Winchester Design Group) met on the vessel to discuss plans for testing the vessel to determine the cause and origin of the ongoing mechanical breakdowns.

132.    While Regal initially indicated it was willing to participate in the testing and scientific investigation to determine the cause of the failures, it reneged on doing so and refused to cooperate with, participate in the testing and sea trials, or provide requested information concerning the vessel's hull construction.

133.    Upon information and belief, Regal backed out of participating in the investigation and testing because it recognized that its design and/or manufacturing deficiencies made the engine bedding system in the hull structure likely the defect causing all the mechanical failures.

134.    The vessel is not merchantable because it cannot function as a recreational yacht without main engines and drives to propel it through the water.

135.    Regal failed to honor its obligations under the written Limited Warranty.

21

136.    Moreover, Regal cannot fix the hull structural defects and the damages caused to the hull by the insufficient engine bedding system and the probable damage to the drive systems on the vessel.

## COUNT I
## MAGNUSON-MOSS FEDERAL TRADE COMMISSION ACT CLAIM
## <u>AGAINST REGAL FOR BREACH OF WRITTEN WARRANTIES</u>

137.    Plaintiff, Raper, realleges the facts in paragraphs 1 through 9, 20 through 47, 50, 51, 53, 55 through 73, and 77 through 136 of the Complaint as if fully set forth herein.

138.    The vessel is a "consumer product" as that term is defined by Title 15 U.S.C. § 2301(1).

139.    One or more of the warranties that Regal gave to Raper is a "written warranty" as that term is defined by Title 15 U.S.C. § 2301(6).

140.    Regal's written warranty is also an express warranty provide to Raper under Florida Statute § 672.313.

141.    Regal has been unable, unwilling and/or has refused to conform the vessel to the written warranties by repairing the structural hull defects that prevent the main engines from being able to operate properly.

142.    Regal was afforded a reasonable opportunity to cure the vessel's non-conformities pursuant to Title 15 U.S.C. § 2310(e).

143.    Title 15 U.S.C. § 2310(d)(1) provides:

> Subject to subsections (a)(3) and (e) of this section, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief....

144.    As a direct and proximate result of Regal's failure to comply with one or more of its written warranties, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

145.    Mr. Raper is not required to pursue an "Informal Dispute Settlement Procedure" as that term is defined by Title U.S.C. § 2310(a) because Regal did not provide for such procedure in the written warranty.  See Exhibit "2".

146.    Mr. Raper is entitled to recover from Regal all costs, attorneys' fees and expert witnesses' fees pursuant to Title U.S.C. § 2310(d)(2).

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages, expert witnesses' fees, attorneys' fees, court costs and such other relief the Court deems proper.

**COUNT II**
**MAGNUSON-MOSS FEDERAL TRADE COMMISSION ACT CLAIM AGAINST**
**REGAL FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

147.    Plaintiff, Raper, re-alleges Paragraphs 1 through 9, 20 through 47, 50, 51, 53, 55 through 74, 76 through 136, 142, 143, 145 and 146 of the Complaint as if fully set forth herein.

148.    At all times material hereto, Regal was and is a merchant in the business of selling boats to consumers.

149.    Privity of contract exists between Raper and Regal for purposes of asserting breach of implied warranty claims.

150.     Regal impliedly warranted that the vessel sold to Raper was merchantable pursuant to Florida Statute § 672.314.

151.     At the time the vessel was delivered to Raper it was unmerchantable because of the structural hull defects described herein.

152.     Regal has been unable, unwilling and/or has refused to conform the vessel to the implied warranty of merchantability by repairing one or more of the non-conformities or structural hull defects described herein within a reasonable number of attempts or a reasonable amount of time.

153.     Regal was afforded a reasonable opportunity to cure the vessel's non-conformities and/or repair the structural hull defects.

154.     As a direct and proximate result of Regal's failure to comply with its implied warranty of merchantability, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages, prejudgment interest, expert witnesses' fees, attorneys' fees, costs and such other relief the Court deems proper.

**COUNT III**
**MAGNUSON-MOSS FEDERAL TRADE COMMISSION ACT CLAIM**
**AGAINST REGAL FOR BREACH OF IMPLIED WARRANTY OF FITNESS**

155.    Plaintiff, Raper, re-alleges Paragraphs 1 through 9, 20 through 47, 50, 51, 53, 55 through 73, 75 through 136, 142, 143, 148 and 149 of the Complaint as if fully set forth herein.

156.    Before the purchase agreement was executed, Raper informed Regal that he was looking to buy a new vessel that he could use for recreational purposes.

157.    Regal impliedly warranted that the vessel sold to Raper was fit for use as a recreational vessel pursuant to Florida Statute § 672.315.

158.    At the time the Vessel was delivered to Raper it was not fit for use as a recreational vessel because of the structural hull defects that cause the main engines to be inoperable.

159.    Regal has been unable, unwilling and/or has refused to conform the vessel to the implied warranty of fitness for a particular purpose by repairing or fixing the structural hull defects described herein within a reasonable number of attempts or a reasonable amount of time.

160.    Regal was afforded a reasonable opportunity to cure the vessel's non-conformities and/or repair the structural hull defects.

161.    As a direct and proximate result of Regal's failure to comply with its implied warranty of fitness for a particular purpose, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages,

prejudgment interest, expert witness fees, attorneys' fees, costs and such other relief the Court deems proper.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY CLAIM**
**<u>AGAINST REGAL UNDER FLORIDA LAW</u>**

162.    Plaintiff, Raper, re-alleges Paragraphs 1 through 7, 20 through 47, 50 through 53, 55, 57 through 73, 77 through 136, 140, and 148 of the Complaint as if fully set forth herein.

163.    Regal has been unable, unwilling and/or has refused to conform the vessel to its express warranties by not repairing or correcting the structural hull defects described herein within a reasonable number of attempts or a reasonable amount of time.

164.    Regal breached its express warranty that the vessel would have a structurally sound hull, including necessary structural supports for the main engines so that they can properly function.

165.    Regal also breached its Limited Warranty that there would be no defects in workmanship and/or materials within one year of the vessel's delivery by not repairing the deficiencies or defects described herein.

166.    Regal was afforded a reasonable opportunity to cure the vessel's non-conformities and/or structural hull defects but it failed to do so.

167.    As a direct and proximate result of Regal's failure to comply with its express warranties, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages, prejudgment interest, costs and such other relief the Court deems proper.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY CLAIM
## AGAINST REGAL UNDER FLORIDA LAW

168.    Plaintiff, Raper, re-alleges Paragraphs 1 through 7, 20 through 47, 50 through 53, 48, 50, 52 through 69, 71, 73 through 133, and 148 through 153 of the Complaint as if fully set forth herein.

169.    Regal has been unable, unwilling and/or has refused to conform the vessel to its implied warranty of merchantability by not repairing or resolving the structural hull defects described herein within a reasonable number of attempts or a reasonable amount of time.

170.    Regal has afforded a reasonable opportunity to cure the vessel's non-conformities and/or repair the vessel's defects.

171.    As a direct and proximate result of Regal's failure to comply with its implied warranty of merchantability, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages, prejudgment interest, costs and such other relief the Court deems proper.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF FITNESS CLAIM
## AGAINST REGAL UNDER FLORIDA LAW

172.    Plaintiff, Raper, re-alleges paragraphs 1 through 7, 20 through 44, 47, 48, 50, 52 through 69, 72 through 133, 148, 149, and 156 through 158 of the Complaint as if fully set forth herein.

173.    Regal has been unable, unwilling and/or has refused to conform the vessel to its implied warranty of fitness for a particular purpose by not repairing or resolving the structural hull defects as alleged herein within a reasonable number of attempts or a reasonable amount of time.

174.    Regal was afforded a reasonable opportunity to cure the vessel's non-conformities and/or repair the vessel's defects.

175.    As a direct and proximate result of Regal's failure to comply with its implied warranty of fitness for a particular purpose, Raper has and continues to suffer damages.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Regal Marine Industries, Inc., and award Raper damages, including, but not limited to, the cost of repairing the vessel, costs and such other relief the Court deems proper.

## COUNT VII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY CLAIM AGAINST
## LEGENDARY MARINE UNDER FLORIDA LAW

176.    Plaintiff, Raper, re-alleges paragraphs 1 through 4, 10 through 45, 50 through 52, 54 through 55, 57 through 72, 77 through 136 of the Complaint as if fully set forth herein.

177.    Legendary impliedly warranted that the vessel sold to Raper was merchantable pursuant to Florida Statute § 672.314.

178.    At the time the vessel was delivered to Raper it was unmerchantable because of the structural hull defects described herein.

179.    Legendary is unable, unwilling and/or has refused to conform the vessel to the implied warranty of merchantability by repairing one or more of the non-conformities or structural hull defects described herein within a reasonable number of attempts or a reasonable amount of time.

180.    Legendary was afforded a reasonable opportunity to cure the vessel's non-conformities and/or repair the structural hull defects.

181.    As a direct and proximate result of Legendary's failure to comply with its implied warranty of merchantability, Raper has and continues to suffer damages.  Mr. Raper's damages include: (a) the purchase price paid for the vessel; (b) monies paid for the vessel's repairs, maintenance, storage and insurance; (c) interest and expenses that Raper paid for his boat loan; (d) prejudgment interest on all amounts Raper paid for the vessel; (e) Raper's travel expenses for dealing with the vessel's breakdowns and repairs; and (f) other expenses.

WHEREFORE, Plaintiff, Donald W. Raper, demands the Honorable Court enter a judgment in its favor against Defendant, Legendary Assets & Operations, LLC d/b/a Legendary Marine, and award Raper damages, prejudgment interest, expert witnesses' fees, attorneys' fees, costs and such other relief the Court deems proper.

**COUNT VIII**
**REVOCATION OF ACCEPTANCE CLAIM AGAINST LEGENDARY MARINE**
**UNDER FLORIDA LAW**

182.    Plaintiff, Raper, re-alleges paragraphs 1 through 4, 10 through 45, 50 through 52, 54 through 55, 57 through 72, 77 through 136 of the Complaint as if fully set forth herein.

183.    This is an alternative cause of action for revocation of acceptance under Florida Statute § 672.608.

184.    The vessel was not merchantable when Legendary sold it to Raper on March 15, 2017.

185.    The hull structure defects were latent and not readily observable by the consumer, Raper.

186.    Mr. Raper did not know the vessel had the hull structure defects described herein at the time he bought it.

187.    The vessel's hull structural defects, hull damages and drive system damages are not capable of being remedied or repaired to restore the vessel to a merchantable condition.

188.    In addition, the vessel's structural defects and damages cannot be fixed to allow the vessel to be used for its intended purposes as a recreational boat capable of going in the ocean and making extended trips.

189.    The Regal Limited Warranty failed of its essential purpose for the reasons alleged herein, including paragraphs 187 and 188.

190.    As a direct and proximate result of Legendary's delivery of a non-conforming vessel with unrepairable defects, Raper has sustained and continues to suffer damages.

WHEREFORE, Plaintiff, Donald W. Raper, demand the Honorable court enter judgment allowing Raper to return the unmerchantable and non-conforming vessel to Defendant, Legendary Assets & Operations, LLC d/b/a Legendary Marine, and award Raper damages including the vessel's purchase price, carrying costs, prejudgment interest and such other and further relief this Court deems proper.

## DEMAND FOR JURY TRIAL

191.    Plaintiff, Donald W. Raper, demands a jury trial.

Dated:  February 16, 2021

                                    Respectfully submitted,

                                    By:  /s/ Farris J. Martin III_____
                                         FARRIS J. MARTIN, III
                                         Florida Bar No. 879916
                                         JAMES W. STROUP
                                         Florida Bar No. 842117
                                         STROUP & MARTIN, P.A.
                                         119 Southeast 12th Street
                                         Fort Lauderdale, Florida  33316
                                         Telephone:  (954) 462-8808
                                         E-mail:  fmartin@strouplaw.com
                                         E-mail:  jstroup@strouplaw.com
                                         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with this Court's CM/ECF docketing system this 16th day of February 2021.

                                    By: /s/ Farris J. Martin, III
                                         FARRIS J. MARTIN, III
                                         Florida Bar No.: 0879916